UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
MARY ANNE HARDING,

                               Plaintiff,

         -against-

NEWBURGH ENLARGED CITY SCHOOL
DISTRICT,

                               Defendant.
--------------------------------------------------------------------X

**STATEMENT PURSUANT
TO LOCAL RULE 56.1**

Case No.: 05 CIV. 4445

Pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, the moving defendant, the Newburgh Enlarged City School District (hereinafter the "District"), by and through its attorneys, Drake, Loeb, Heller, Kennedy, Gogerty, Gaba, and Rodd, PLLC, submits the following statement of undisputed facts in connection with its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure:

<u>**PLAINTIFF'S MEDICAL/EMPLOYMENT HISTORY
PRIOR TO SEPTEMBER, 2003**</u>

    1.      The plaintiff is currently 51 years of age, and remains employed, full-time, for the District. <u>See</u>, Exhibit "H," at p.5, lines 2 to 3, and Exhibit "K," pp. 4 to 5, lines 24 to 25, and lines 2 to 3, respectively.

    2.      The plaintiff alleges that she has suffered from asthma for most of her life, and claimed, in her initial Verified Charging Complaint filed with the EEOC in February of 2004, that this particular condition – her asthma - constituted an impairment of a major life activity. <u>See</u>, Exhibit "A," at ¶ 9 and ¶ 10.

3.      From the time the plaintiff first began working, up until the time she was

20 or 21, the plaintiff was employed as a babysitter, a stock person/cashier, a

saleswoman, and a child care technician, and was able to fulfill the requirements of those

jobs despite her asthma.  <u>See</u>, Exhibit "I," at pp. 34 to 35, lines 13 to 23, and lines 1 to 10,

respectively.

4.      After taking time off from working – to attend school, and to have

children – the plaintiff re-entered the workforce in approximately 1981.  <u>See</u>, Exhibit "I,"

at pp. 36 to 37, lines 16 to 23, and lines 1 to 12, respectively.

5.      From 1981 – when the plaintiff re-entered the work force – and for the

following 17 years, the plaintiff, despite her asthma, was able to work at a broad and

diverse number of teaching and administrative jobs, in New York and then in California,

including employment at Our Lady of Refuge, the Sugar Loaf School District, the

Monticello School District, Ulster BOCES, the Warwick Valley School District, the

Jefferson-Youngsville Central School District, the Stockton Unified School District, and

the San Joaquin County Office of Education.  <u>See</u>, Exhibit "I," p. 37, line 2 to p. 47, line

5.

6.      The plaintiff did not advise her employers at Our Lady of Refuge, the Sugar

Loaf School District, the Monticello School District, Ulster Boces, the Warwick Valley

School District, the Jefferson-Youngsville Central School District, the Stockton Unified

School District or the San Joaquin County of Education, that she was disabled.  <u>See</u>,

Exhibit "I," at p. 37, line 2 to p. 45, line 22.

7.      After leaving the San Joaquin County of Education the plaintiff began

working as a telemarketer, in 1999, for Dial America.  <u>See</u>, Exhibit "H," p. 30, lines 6 to

9.

8.      The plaintiff was able to work as a telemarketer despite her asthma, and did not advise Dial America that she was in any way disabled. <u>See</u>, Exhibit "I," p. 47, lines 6 to 23.

9.      Thereafter, and before beginning work for the District, the plaintiff worked Summers at the Highland Residential Facility (<u>See</u>, Exhibit "H," p. 30, lines 1 to 2), and at the New York Military Academy (<u>See</u>, Exhibit "I," p. 62, lines 8 to 20).

10.     With respect to <u>all</u> of the plaintiff's employers prior to September of 2003, the plaintiff never advised any of them that she was unable to work or carry out her job responsibilities due to asthma. <u>See</u>, Exhibit "I," p. 64, lines 9 to 18.

11.     The plaintiff was never told that her asthma disqualified her from any lines of employment, or teaching in general. <u>See</u>, Exhibit "J," p. 32, lines 4 to 12.

12.     Prior to September of 2003, the plaintiff never was disqualified, from any job she ever held, due to allergies or asthma. <u>See</u>, Exhibit "J," p.30, lines 6 to 8.

13.     The plaintiff commenced her employment with the District in September of 1999.  At that time, the plaintiff was hired to work as a full-time reading and writing specialist at a junior high school within the District called the Heritage Junior High School (hereinafter "Heritage")  The plaintiff worked at Heritage from 1999 until 2002. <u>See</u>, Exhibit "H," at pp. 30-31, lines 13 to 23 and lines 1 to 3, respectively.

14.     Upon the plaintiff's commencement of employment with the District, she did not advise anyone from the District that she had any physical problems; that she needed any sort of accommodations for any medical issues; or that she was otherwise disabled or handicapped in any way. <u>See</u>, Exhibit "H," at p. 33, line 23 to p. 35, line 7.

DRAKE LOEB HELLER KENNEDY GOGERTY GABA & RODD PLLC
555 HUDSON VALLEY AVENUE, SUITE 100, NEW WINDSOR, NEW YORK 12553
PHONE: 845-561-0550

15. While working at Heritage in December of 2000, the plaintiff sustained certain injuries as a result of being pushed in the back by another student. See, Exhibit "H," at pp. 35-36.

16. The plaintiff returned to work following the December, 2000 incident at the same job position and at the same hours that she had worked before the December, 2000 incident. See, Exhibit "H," at p. 39, lines 6-10.

17. The plaintiff's medical clearance allowing her to return to work following the December 2000 incident indicated that the plaintiff could return to without restrictions. See, Exhibit "X."

18. The plaintiff did not seek or ask for any sort of accommodations after she returned to work following the December, 2000 incident. See, Exhibit "H," at pp. 41-42, lines 21-23 and lines 1-8, respectively.

19. In December of 2001 the plaintiff sustained injuries on a second occasion when she attempted to break up a fight between two girls. See, Exhibit "H," at p. 46, lines 19-22.

20. Following the December, 2001 incident, the plaintiff was able to return to work in January of 2002 at her same full-time job position with the same job duties. See, Exhibit "H," at p. 47, lines 13-23.

21. Upon the plaintiff's return to work after the December 2001 incident, the plaintiff did not ask anyone from the School District for any sort of accommodations for her injuries. See, Exhibit "H," at p. 48, lines 4-7.

22. Following the December 2001 incident, the plaintiff did not tell any District personnel that she had any physical problems or impairments which precluded

her from carrying out and performing her job duties. See, Exhibit "H," at pp. 50-51, lines 17-23, lines 1-11.

23. Following the December 2001 incident, the plaintiff was cleared to return to work without any medical restrictions. See, Exhibit "Y."

24. Following the December, 2001 incident, the plaintiff continued working a full-time basis until the end of the 2002 school year. See, Exhibit "H," at p. 51, lines 18-21.

25. At the end of the 2001/2002 School year, all reading specialists at Heritage had their positions terminated from that school, and the plaintiff was accordingly transferred to the Temple Hill Academy (hereinafter Temple Hill), another school within the District. See, Exhibit "H," pp. 30-31, lines 22-23, and lines 1-10, respectively.

26. The plaintiff admitted that she was upset about being transferred to Temple Hill, since she wanted to remain at Heritage. See, Exhibit "H," at p. 31, lines 13-14.

27. During the Summer of 2002, the plaintiff worked, on a full-time basis, for another employer - the Highland Residential Facility - as a teacher. See, Exhibit "H," at p. 53, lines 12-15.

28. At no time in the Summer of 2002 did the plaintiff advise anyone from the Highland Residential Facility that she was disabled. See, Exhibit "H," at p. 53, lines 18-20.

29. The plaintiff began working at Temple Hill in September of 2002, and worked on a full-time basis during the entirety of the 2002/2003 school year. See, Exhibit "H," at pp. 53-54, lines 21-23 and lines 1-6, respectively.

30.     The plaintiff admitted to using stairs while at Temple Hill, and did not, at any point during the 2002/2003 school year, ever tell any personnel from the school that she needed any sort of special accommodations for any physical problems. See, Exhibit "H," at p. 55, lines 1-13.

31.     During the 2002/2003 school year, due to a shortage of classroom space, the plaintiff shared a room at Temple Hill with another teacher, Mirsini Milner. The plaintiff described this room as being located adjacent to the primary library. See, Exhibit "H," at pp. 56-57, line 23 and lines 1-6.

32.     The plaintiff claimed that the room she shared with Ms. Milner was not satisfactory to her as she found that sharing the room made teaching difficult. See, Exhibit "H," at pp. 58, lines 6-8.

33.     During the 2002/2003 school year, it was the plaintiff's preference to have no more than six students sent to her during a teaching period, but this request was not honored by personnel at Temple Hill. See, Exhibit "H," at pp. 62-63, lines 11-23 and lines 1-6.

34.     The plaintiff felt, during the 2002/2003 school year, that reading was not a priority at Temple Hill because reading teachers were assigned to be substitute teachers – thus forcing the cancellation of reading classes, and because reading classes were conducted in rooms that were way too small for large groups of students. See, Exhibit "I," pp. 96 to 97, lines 21 to 23, and lines 1 to 11.

35.     Due to issues the plaintiff was having at Temple Hill during the 2002/2003 school year, the plaintiff had asked for a transfer from Temple Hill to another school before September of 2003. See, Exhibit "I," pp. 73 to 74, lines 18 to 23, and lines 1 to 4, respectively, and pp. 96 to 97, lines 21 to 23 and lines 1 to 18, respectively.

36.     In the Summer of 2003, and following the plaintiff's completion of her 2002/2003 school year at Temple Hill, the plaintiff continued to work on a full-time basis at the Highland Residential Facility, and did not ever tell anyone in the Summer of 2003 that she had any sort of disability.  See, Exhibit "H," at p. 56, lines 1-22.

37.     At the Highland Residential Facility, and during the Summer of 2003, the plaintiff taught five (5) days per week.  See, Exhibit "I," pp. 86 to 87, line 23, and lines 1 to 5, respectively.

38.     While working at the Highland Residential Facility in the Summer of 2003, she walked up two flights of stairs on a daily basis.  See, Exhibit "I," p. 85, line 5 to p. 87, line 14.

39.     The plaintiff never told anyone at the Highland Residential Facility that she had any medical problems regarding stairs.  See, Exhibit "I," p. 87 lines 15 to 18.

### EVENTS AT TEMPLE HILL – SEPTEMBER, 2003

40.     When the plaintiff first began working at Temple Hill in the beginning of September of 2003, she did not advise anyone from the District that she was either disabled or needed any sort of accommodations for any type of impairments.  See, Exhibit "H," at p. 65, lines 6-20; Mucci Affidavit, ¶ 6.

41.     In response to the plaintiff's dissatisfaction concerning the space problem in the room she shared with Ms. Milner, the plaintiff was provided, in the middle of September of 2003, with another room to teach in at Gardnertown.  See, Exhibit "H," at pp. 67-68, line 23 and lines 1-5.

42.     The room that the plaintiff was offered to teach in was formerly a faculty lounge area, and was in the process of being refurbished, at the District's expense, into classroom space for use by the plaintiff.  See, Mucci Affidavit, ¶ 7.

43.     When the plaintiff first inspected her new classroom she alleges that the room was dirty and had a bad odor. <u>See</u>, Exhibit "H," at p. 72, lines 1-11.

44.     Following this observation, the plaintiff spoke with a female custodian at Temple Hill and asked that custodian to clean the room, to which the custodian replied that she would take care of it. <u>See</u>, Exhibit "H," at pp. 72-73, lines 17-23 and lines 1-8.

45.     In response to the plaintiff's request, and when she began to move her things into her new room, the plaintiff did notice that an attempt had been made to clean the room. <u>See</u>, Exhibit "H," at pp. 75-76, lines 17-23 and lines 1-5.

46.     In response to the plaintiff's complaints about her room, the plaintiff was advised that the District would continue to clean and renovate the room. <u>See</u>, Exhibit "I," p. 107, lines 5 to 14.

47.     The plaintiff claims that as she began to move her belongings into her new room, she began to feel sick. <u>See</u>, Exhibit "H," at p. 82, lines 2-9.

48.     During the first week of being assigned to her new room, the plaintiff recalled teaching only two or three classes in her new room. <u>See</u>, Exhibit "H," at p. 90, lines 6-12.

49.     The plaintiff also recalled missing one day from school, during her first week of teaching in her new room, as a result of an asthmatic reaction to her new room. <u>See</u>, Exhibit "H," at p. 89, lines 9-18.

50.     During the time that the plaintiff began teaching in her new room at Temple Hill, the plaintiff felt dissatisfied over the fact that she was being forced to teach reading instruction, not reading remediation. <u>See</u>, Exhibit "I," p. 98, lines 17 to 23.

51.     As a result of the breathing problems the plaintiff claimed to have as a result of the new room, and the new room's limited space, the plaintiff was permitted to

teach in alternate locations within the school, including the primary library as well as in the cafeteria. These alternate locations for teaching were offered to the plaintiff by the Principal of Temple Hill – Edward Mucci. See, Exhibit "H," at pp. 92-93, lines 11-23 and lines 1-23, respectively; Mucci Affidavit, ¶ 8.

52.    The alternate teaching locations within Temple Hill were offered to the plaintiff, as opposed to transferring the plaintiff out of the school altogether, because the plaintiff's position of reading teacher was needed at Temple Hill. See, Exhibit "I," p. 113, lines 7 to 9; Mucci Affidavit, ¶ 3.

53.    The plaintiff admitted that teaching in the primary library and the cafeteria did not cause the plaintiff any health problems, and alleviated her health concerns relating to her new room. See, Exhibit "H," at p. 95, lines 16-20; Exhibit "I," at p.100, lines 13 to 20, and at p. 106, lines 14 to 19; Mucci Affidavit, ¶ 8.

54.    Other teachers at Temple Hill have commonly taught in the libraries and cafeteria, as well as in other non-traditional classroom settings, due to a shortage of classroom space at Temple Hill, and throughout the District. See, Mucci Affidavit at ¶ 5 and ¶ 8; Wilson Affidavit at ¶ 5; Knight Affidavit, ¶ 4; Penfold Affidavit, ¶ 5; and Exhibits "M" and "N."

55.    In addition to offering the plaintiff the primary library and cafeteria, as alternate locations in which teach, Principal Mucci also offered the plaintiff a room on the third floor, as well as a space adjacent to a band room. The plaintiff did not attempt to use these areas which were offered to her, and even declined to try, on the basis that the areas were, in her opinion, dirty and not ventilated. See, Exhibit "H," at pp. 104-105, lines 9-23 and lines 1-22.

56.     After the plaintiff was offered to reach in a room on the third floor, an area adjacent to the band room, the primary library and the cafeteria, Principal Mucci offered the plaintiff space in the main library of the Temple Hill in which to teach.  See, Exhibit "H," at pp. 106-107, lines 14-23 and lines 1-4; Mucci Affidavit, ¶ 9.

57.     Although the plaintiff admitted she had no health issues or medical concerns with teaching in the main library, she refused to work in this location (See, Exhibit "H," at p. 123, lines 3-8, and Exhibit "I," at p.110, lines 4 to 9).

58.     At no point in September of 2003, or at any point in 2003 for that matter, did the plaintiff ever request to teach in the reading position then filled by another teacher, Debbie Barnette, at the Gardertown Fundamental Magnet School – which is another elementary school in the District.  See, Exhibit "I," lines 115, lines 5 to 14.

59.     The plaintiff ceased working at Temple Hill at the end of September of 2003 because she claimed an inability to work.  See, Exhibit "H," at p. 112, lines 4-5 and p. 113, lines 11-19.

60.     When the plaintiff ceased working at Temple Hill, her physician, Dr. Gulati, advised, by letter dated September 29, 2003, that the plaintiff was "now disabled" and unable to work due to her asthma.  See, Exhibit "Z," and Exhibit "GG."

61.     Dr. Gulati's September 29, 2003 letter submitted to the District indicated that "when" the plaintiff was able to work, "she will be need to be located in a classroom that is free from mold, dust, odors, fumes and other irritants that she is allergic to and exacerbate her asthma."  See, Exhibit "Z."

62.     Dr. Gulati's September 29, 2003 letter imposed no restrictions on the plaintiff's use at work of stairs or inclines. See, Exhibit "Z."

63.    Following the submission of Dr. Gulati's September 29, 2003 letter to the District, notes from Dr. Gulati were submitted to the District indicating the plaintiff's continued inability to work for the remainder of 2003 due to the diagnosis of "asthma exposure to mold," "asthma," and "complications from asthma." See, Exhibits "AA," "BB" and "CC."

64.    During the same time period that the plaintiff ceased reporting to work for the District due to her claimed "disability" and "inability to work," the plaintiff in fact continued to work, two (2) nights per week, for her other employer - the Orange County Community College. See, Exhibit "I," pp. 56 to 57, lines 10 to 23, and lines 1 to 8; Exhibit "FF."

65.    During the time period that the plaintiff stopped working for the District (but continued to work for her other employer, the Orange County Community College), the plaintiff was able to dress herself, attend to her personal hygiene, drive, shop, do laundry, and cook, without requiring any assistance to perform any of her everyday regular chores and tasks. See, Exhibit "H," at pp. 117-118, lines 3-23 and lines 2-9.

66.    Despite the fact that the plaintiff had stopped working at the end of September of 2003, she continued to receive her full and regular bi-weekly paychecks up until the time that she returned to work in March of 2004. See, Exhibit "H," at p. 116, lines 4-9; Lastowski Affidavit, ¶ 5.

67.    In fact, while the plaintiff remained out of work, she received a salary increase. See, Exhibit "H," at p. 116, lines 17-21.

68.    On November 3, 2003, the plaintiff was advised by her own Union – the Newburgh Teachers Association – that following the District's remediation of the faculty room, "the room is now clean and safe, using generally accepted Mt. Sinai standards."

See, Exhibit "Q," Exhibit "I," pp. 111 to 112, lines 20 to 23 and lines 1-14; Mucci Affidavit, ¶ 12.

69.    The plaintiff received clearance to return to work as of January 5, 2004, and accordingly met with Principal Mucci at Temple Hill to discuss teaching arrangements at Temple Hill. See, Exhibit "H," at pp. 125-126, lines 8-23 and lines 1-7.

70.    At that time, the plaintiff was initially offered to return to the room she was assigned to, as it had been cleaned. See, Exhibit "H," at p. 126, lines 8-13.

71.    Despite the fact that the plaintiff's own Union had indicated that as a result of the District's remediation of the room it was then clean and safe (See, Exhibit "Q"), the plaintiff declined to even attempt to use the room. See, Exhibit "H," at p. 127, lines 9-11.

72.    After the plaintiff declined that room, Principal Mucci offered yet another location for the plaintiff to teach in – to wit, a balcony area in the main library. See, Exhibit "H," at p. 127, lines 12-18.

73.    The plaintiff declined this location on the basis that same was accessed by stairs. See, Exhibit "H," at p. 127, lines 13-18.

74.    The plaintiff admitted that as of the Fall of 2003 she lived in a three-story townhouse, which contained stairs which she used on a daily basis. See, Exhibit "H," at pp. 127-128, lines 19-23 and lines 1-9, respectively.

75.    Plaintiff's counsel's December 23, 2003 letter sent to the District, which addressed the accommodations sought by the plaintiff, made no mention of any orthopedic problems on the part of the plaintiff, and made no mention of any problems or difficulties with using stairs. See, Exhibit "DD."

76.     Following the January 5, 2004 meeting with Mr. Mucci at Gardnertown, the plaintiff submitted to the District another note from her physician, a Dr. Gulati, dated January 13, 2004, which then indicated that "Ms. Harding is unable to work in an area that must be accessed via an incline or stairs." See, Exhibit "EE."

77.     All schools in the District have stairs and/or inclines. See, Knight Affidavit, ¶ 3.

78.     In March of 2004, the plaintiff was advised, by one of her Union representatives, that there was a teaching position which then was available at Gardnertown. See, Exhibit "H," at pp. 130-131, lines 10-23 and lines 1-4, respectively.

79.     When the plaintiff toured Gardnertown with John Knight, who was then the Director of Human Resources for the District, Mr. Knight advised the plaintiff that the school was being shown to her as a courtesy since Mr. Knight understood, from the plaintiff's previously submitted physician notes, that Gardnertown did not appear to be medically suitable as it contained a steep incline/ramp within its main hallway. See, Knight Affidavit, ¶ 5.

80.     In response to being advised of this, the plaintiff told Mr. Knight that the existence of the incline/ramp did not matter, as she "could get her doctor's note changed." See, Knight Affidavit, ¶ 6.

81.     The plaintiff lost no benefits, of any kind, during the time period in which she remained out of work. See, Exhibit "H," at p. 138, lines 4-8; Lastowski Affidavit, ¶ 4.

82.     The plaintiff commenced employment at Gardnertown, as a reading teacher, in March of 2004, and has remained employed as a reading teacher at

Gardnertown up through the present date. See, Exhibit "K," at pp. 4-5, lines 24-25 and lines 2-6, respectively.

83.    From 2004 up to the present date, the plaintiff has received annual salary increases, and has suffered no loss or reduction in any of her benefits. See, Lastowski Affidavit, ¶ 4; Exhibit "I," at pp. 20-21, lines 5-23 and lines 1-8, respectively.

84.    From the time that the plaintiff began teaching at Gardnertown in March of 2004, up through the time of the plaintiff's deposition conducted on August 25, 2006, the plaintiff admitted that she did not receive any negative reports about her work while employed at Gardnertown. See, Exhibit "I," at pp. 19-20, line 23 and lines 1-4, respectively.

85.    From the time that the plaintiff began at Gardnertown in March of 2004, and up until the time of the plaintiff's deposition conducted on August 25, 2006, the plaintiff testified that she never complained to anyone about any of her job conditions at Gardnertown, and testified that as of that time she was otherwise satisfied with her job. See, Exhibit "I," at page 22, lines 16-23.

86.    The plaintiff admitted that she had no recollection of ever telling anyone at Gardnertown that she had filed either an EEOC complaint or a civil action against the District at any time. See, Exhibit "I," at pp. 17-18, lines 21-23 and lines 1-17, respectively.

87.    While at Gardnertown, the plaintiff claims that the following incidents and actions constituted acts of retaliation: (a) a meeting convened to address an allegation made against the plaintiff by another faculty member that the plaintiff discriminated against Hispanic students; (b) being asked to substitute more than other teachers; (c) alleged inappropriate conduct on the part of Principal Wilson during a parent-teacher

conference in November of 2005; (d) Ms. Wilson's alteration of a misconduct charge of a student; (e) the plaintiff's removal from the "IST;" (f) Principal's Wilson's alleged mishandling of the plaintiff's report of a child abuse incident; (g) Principal Wilson's handling of issues relating to handicapped parking spaces; (h) the plaintiff's assignment to late bus duty; (i) Principal Wilson's handling of the plaintiff's late submission of progress reports; (j) the denial of the plaintiff's request for a transfer to another school; and (k) Principal Wilson's convening of a November, 2006 grade level meeting with the plaintiff. See, Exhibit "L," p. 168, line 3 to p. 170, line 19.

88.    The plaintiff claims that at some point in 2004 a meeting was convened by then Assistant Principal Gail Wilson to address concerns arising out of an allegation against the plaintiff made by another teacher at Gardnertown – Ms. Gina Juneau. See, Wilson Affidavit, ¶ 7 and ¶ 8.

89.    The District learned that Ms. Juneau accused the plaintiff of discriminating against Hispanic students because several of those students, who wore cologne, were sent out of the plaintiff's class because the perfume or cologne caused the plaintiff to suffer an adverse physical reaction. See, Wilson Affidavit. ¶ 7 and ¶ 8.

90.    At the meeting convened to address the allegations of discrimination lodged by Ms. Juneau against the plaintiff, the teachers who would send their students to Ms. Harding's class for reading instruction were told to advise their students not to wear cologne or perfume if being sent to the plaintiff's class, and to be sensitive and accommodating to the plaintiff's medical concerns. See, Wilson Affidavit, ¶ 7 and ¶ 8.

91.    Following the meeting, the plaintiff admitted that some teachers did make an effort to keep students who wore heavy cologne away from the plaintiff's class. See, Exhibit "K," pp. 52-53, lines 23-25 and lines 2-25.

DRAKE LOEB HELLER KENNEDY GOGERTY GABA & RODD PLLC

555 HUDSON VALLEY AVENUE, SUITE 100, NEW WINDSOR, NEW YORK 12553

PHONE: 845-561-0550

92.     The plaintiff admitted that the meeting involving the cologne was convened by Ms. Wilson because Ms. Wilson was concerned that the plaintiff and Ms. Juneau were not friendly, and because Ms. Wilson wanted to make the situation better. See, Exhibit "K," pp. 46-47, lines 24-25 and lines 2-7.

93.     The plaintiff admitted that after the meeting, when the plaintiff's sensitivity to cologne was discussed, Ms. Juneau did not, to the plaintiff's knowledge, ever again accuse the plaintiff of discrimination against Hispanics.  See, Exhibit "K," page 63, lines 6-12.

94.     The practice at the Gardnertown, both before and during the plaintiff's employment at Gardnertown, has been to utilize specialty teachers – of which the plaintiff is one – to serve as a substitute when necessary.  See, Wilson Affidavit, ¶ 9.

95.     The plaintiff has been called to substitute less than all of the other specialty teachers at Gardnertown.  See, Wilson Affidavit, ¶ 9.

96.     The plaintiff has no knowledge as to the number of times in which she was asked to substitute during the 2005/2006 school year.  See, Exhibit "L," p. 133, lines 15-17.

97.     The plaintiff has no knowledge of the number of times in which she actually served as a substitute during the 2005/2006 school year.  See, Exhibit "L," p. 133-134, line 23 and line 1, respectively.

98.     The plaintiff has no knowledge as to the number of times in which other specialty teachers substituted in 2005/2006.  See, Exhibit "L," p. 136, line 22 to p. 137, line 15.

99.    At some point during the 2005/2006 school year the plaintiff complained to then Principal Rumberg about the frequency in which she was asked to substitute. See, Exhibit "L," p. 138, lines 16-19.

100.    The plaintiff admitted that after she complained to Principal Rumberg, the frequency in which she was asked to substitute declined, and the frequency in which the plaintiff was asked to substitute became acceptable to her. See, Exhibit "L," p. 139, lines 6-9, and p. 141, lines 7-11.

101.    The plaintiff had no knowledge at all as to who actually made the decision about substitute assignments during the 2005/2006 school year. See, Exhibit "L," p. 142, lines 2-4.

102.    The plaintiff is presently satisfied with the frequency in which she is asked to substitute during the 2006/2007 school year. See, Exhibit "L," p. 133, lines 4-8.

103.    The plaintiff has no knowledge as to whether the frequency in which she was asked to substitute was related to her underlying disability discrimination claims against the District. See, Exhibit "L," p. 143, lines 4-9.

104.    In November of 2005, during a parent/teacher night, then Assistant Principal Wilson announced over the PA, towards the end of the scheduled parent/teacher conferences, that the scheduled conferences would be shortly coming to an end. See, Wilson Affidavit, ¶ 15.

105.    Assistant Principal Wilson then personally advised all teachers, not just the plaintiff, that the parent/teacher conference was coming to an end, and this action was undertaken simply because the conferences were scheduled to terminate. See, Wilson Affidavit, ¶ 15.

106.    At some point during the 2005/2006 school year, then Assistant Principal Wilson reviewed a disciplinary report written by the plaintiff regarding misconduct of a first grader in the plaintiff's class. See, Wilson Affidavit, ¶ 13.

107.    Based upon then Assistant Principal Wilson's investigation into the incident underlying the disciplinary report, Assistant Principal Wilson felt it appropriate to modify the description of the offense referenced in the disciplinary report. See, Wilson Affidavit, ¶ 13.

108.    The plaintiff was a member of the Instructional Support Team (IST) from the time she first began at Gardnertown until September of 2006. See, Exhibit "L," p. 157, lines 10-14.

109.    The plaintiff's membership on the IST was not a paid position, and as a result of the plaintiff's removal from the IST, she lost no pay and incurred no decrease in benefits. See, Exhibit "L," pp. 157-158, line 23, and lines 1-5, respectively.

110.    The decision to remove the plaintiff from the IST was made by the IST chairperson, Jean Trizinski, for reasons entirely unrelated in any way to her underlying disability discrimination claims. See, Trizinski Affidavit, ¶ 5-8.

111.    The plaintiff believes that her removal from the IST was based on the fact that she had declined to assume the role of chairperson for the IST in the past. See, Exhibit "L," p. 163, lines 11-17.

112.    The plaintiff was required to submit her progress reports, at Gardnertown, prior to February 2, 2007. See, Wilson Affidavit, ¶ 18.

113.    The plaintiff admitted that her progress reports were not submitted, as required, prior to February 2, 2007. See, Exhibit "L," p. 166, lines 13 to 15.

114. Principal Wilson advised the plaintiff that her progress reports, which were due on February 2, 2007, were late. See, Wilson Affidavit, ¶ 18; Exhibit "L," p. 166, lines 3-15.

115. The plaintiff, in September of 2006, claims that she advised Principal Wilson that one of her students reported that she had been hit by her mother. See, Exhibit "L," p. 173, lines 10-13.

116. Principal Wilson did advise personnel in the nursing office of this complaint on the same day that the information was received from the plaintiff. See, Wilson Affidavit, ¶ 25.

117. Although the plaintiff claims that there was a delay on Principal Wilson's part in reporting the incident involving the student who claimed she was hit, the plaintiff has no knowledge as to why the delay occurred. See, Exhibit "L," pp. 177-178, line 23 and lines 2-3, and page 179, lines 3-7.

118. On November 29, 2006, the plaintiff met with Principal Wilson about a concern the plaintiff had about a parent wanting to take a child out of the plaintiff's reading class. See, Exhibit "K," p. 63, lines 19-25.

119. The November 29, 2006 meeting with Principal Wilson was prompted by the plaintiff's receipt of a letter, from the parent of one of the students in the plaintiff's reading class, which indicated that after the parent had conferred with another teacher – a Ms. Schneider – both the parent and Ms. Schneider felt that the student no longer needed to attend the plaintiff's reading class. See, Exhibit "K," p. 67, lines 13-23; Exhibit "HH;" Wilson Affidavit, ¶ 10.

120.    The plaintiff disagreed with the advice given by Ms. Schneider to the parent, and based upon the plaintiff's concern about the situation, brought this matter to the attention of Ms. Wilson.  <u>See</u>, Exhibit "K," pp. 67-68, lines 24-25 and lines 2-22.

121.    The issue presented to Principal Wilson on November 29, 2006 involved differing reports given to parents of student academic performance as between the plaintiff and the students' primary teachers.  <u>See</u>, <u>Wilson</u> Affidavit, ¶ 10.

122.    Based upon Principal Wilson's concerns about issues relating to how the plaintiff and the primary teachers were reporting students' academic performances to parents, Principal Wilson scheduled a meeting for November 30, 2006 with teachers to address the situation in an collaborative manner.  <u>See</u>, <u>Wilson</u> Affidavit, ¶ 10 and ¶ 11.

123.    The plaintiff did not communicate any objections to attending the November 30, 2006 meeting.  <u>See</u>, Exhibit "K," pp. 73-74, lines 24-25 and line 2, respectively.

124.    During the November 30, 2006 meeting, the issue of reporting student performance to parents was discussed.  <u>See</u>, Exhibit "K," page 81, lines 14-16.

125.    At the November 30, 2006 meeting, some of the teachers in attendance expressed dissatisfaction with the plaintiff's progress reports.  <u>See</u>, Exhibit "K," p. 85, line 6 to page 86, line 6.

126.    None of the teachers who attended the November 30, 2006 meeting thought the meeting was convened for improper reasons, or was otherwise somehow "retaliatory."  <u>See</u>, Exhibit "II."

127.    In November of 2006, the plaintiff applied for two (2) jobs in the District – a Reading/Writing Specialist at the Horizons-on-Hudson Magnet School ("Horizons"),

and an English-AIS position at the North Junior High School. <u>See</u>, Exhibit "L," p. 180, lines 7-17.

128.     The position for the Horizons required any applications for this position to be received by the District's Human Resources Department by 4:00 p.m. on November 21, 2006. <u>See</u>, <u>Leimer</u> Affidavit, ¶ 8; Exhibit "T."

129.     The plaintiff first applied for the Horizons position on November 28, 2006, and her application was not received by the District's Human Resources Department until November 30, 2006. <u>See</u>, <u>Leimer</u> Affidavit, ¶ 8; Exhibit "U."

130.     The plaintiff was not considered for the Horizons position because she failed to submit her application on time. <u>See</u>, <u>Leimer</u> Affidavit, ¶ 8; Exhibit "U."

131.     The English-AIS position at the North Junior High School required that applications for this position be received by the District's Human Resources Department by 4:00 p.m. on November 28, 2006. <u>See</u>, <u>Leimer</u> Affidavit, ¶ 9; Exhibit "V."

132.     The plaintiff's application for the English-AIS position at the North Junior High School was received by the District's Human Resources Department on November 30, 2006, two days after the posting deadline. <u>See</u>, <u>Leimer</u> Affidavit, ¶ 9; Exhibit "W."

133.     The plaintiff did not receive a transfer to the North Junior High School because her application was not received on time. <u>See</u>, <u>Leimer</u> Affidavit, ¶ 9; Exhibit "W."

134.     The assignment of specialty teachers at Gardnertown to perform late bus duty has been a practice in place for years before the plaintiff even arrived at the school. <u>See</u>, <u>Wilson</u> Affidavit, ¶14; Exhibit "K," at p. 35, lines 22-25.

135.     The plaintiff never complained to Principal Wilson about the issue of being assigned late bus duty. <u>See</u>, Exhibit "K," p. 101, lines 22 to 24.

DRAKE LOEB HELLER KENNEDY GOGERTY GABA & RODD PLLC
555 HUDSON VALLEY AVENUE, SUITE 100, NEW WINDSOR, NEW YORK 12553
PHONE: 845-561-0550

136.      The plaintiff's first complaint about doing late bus duty was made to a representative from her Union, in September or October of 2006. <u>See</u>, Exhibit "K," pp. 102 to 103, lines 22 to 25, and lines 2 to 8.

137.      With respect to the issue of handicapped parking spaces at Gardnertown, the plaintiff first made an issue or complained about the situation in September of 2006. <u>See</u>, Exhibit "K," pp. 109 to 110, lines 23 to 25, and lines 2 to 9.

138.      In September of 2006 Principal Wilson told the plaintiff of the handicapped parking space policy at Gardnertown, and told the plaintiff she could use any of the handicapped parking spaces she wished to use. <u>See</u>, <u>Wilson</u> Affidavit, ¶ 20.

139.      The plaintiff's complaint about handicapped parking spaces at that time was that it appeared to her that handicapped parking spaces were being used by other faculty members who the plaintiff believed should not be using the spots. <u>See</u>, Exhibit "K," p. 111, lines 7 to 24.

140.      The practice at Gardnertown, which was in place before the plaintiff first began working at Gardnertown, was that handicapped parking spaces are freely available to anyone who feels the need to use these parking spaces, on a "first-come, first-serve" basis. <u>See</u>, <u>Wilson</u> Affidavit, ¶ 19.

141.      In January of 2007 the parking lot at Gardnertown was reconfigured, and pursuant to instructions received by Principal Wilson from the District's Human Resource Office, anyone who wished to use a handicapped parking spot needed to submit a doctor's note authorizing same. <u>See</u>, <u>Wilson</u> Affidavit, ¶ 22.

142.      Principal Wilson, based on the instructions she received from the District's Human Resource Office, told all teachers who were the handicapped parking spots at Gardnertown, that they need doctor's notes. <u>See</u>, <u>Wilson</u> Affidavit, ¶ 22.

143.    The plaintiff brought in a doctor's note, as requested, and has been parking in a handicapped parking spot without complaint.  See, Exhibit "K," at p. 119, line 13.

Dated: New Windsor, New York
        June 14, 2007

> Yours, etc.
>
> DRAKE, LOEB, HELLER, KENNEDY,
> GOGERTY, GABA & RODD, PLLC
>
> By: _____
>        ADAM L. RODD (AR-3484)
>        Attorneys for Defendant
>        555 Hudson Valley Avenue
>        Suite 100
>        New Windsor, New York 12553
>        Tel. No.:  (845) 561-0550

TO:    BARRY D. HABERMAN, ESQ.
        Attorney for Plaintiff
        254 South Main Street
        Suite 401
        New City, New York 10956